McCRORY STORES CORPORATION *vs.* MARY E. SATCHELL.

*Authority of Servant—Wrongful Act—False Imprisonment.*

If property be entrusted to an agent or servant for sale or safekeeping, there is an implied authority for him to do all things proper and necessary for its protection.          p. 284

For all acts done within the scope of the employment and the limits of the implied authority, the master is liable, however erroneous, mistaken or malicious such acts may be.          p. 285

For a servant's acts which are not within the scope of the employment and the limits of the implied authority, the master is not liable, unless express authority be shown, or there be subsequent ratification or adoption.          p. 285

An employee, having custody of property, has no implied authority to take steps to punish one whom he mistakenly supposes to have done something to the property, though he

has authority to protect the property by preventing a felony or recovering it back.                                    pp. 285, 286

The sole manager of a store, to whom was intrusted the goods and property contained therein for sale and safekeeping, had implied authority to protect the goods and prevent them from being stolen, as well as to recover them if stolen, and the owner of the store was consequently liable for his conduct in assaulting and detaining and searching a customer, on the mistaken assumption that the latter had taken and had with her an article belonging to the store.                                    pp. 286, 287

A motion to strike out the entire answer to a question, when part of it was admissible, was properly refused.                                    p. 288

*Decided May 22nd, 1925.*

Appeal from the Circuit Court for Kent County (WICKES, J.).

Action by Mary E. Satchell against McCrory Stores Corporation. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*T. Hughlett Henry,* for the appellant.

*Wm. Pepper Constable* and *William T. Fryer,* with whom were *Chas. J. Butler, S. Scott Beck,* and *John D. Alexander,* on the brief, for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an action for assault and false imprisonment. The appellant, defendant below, is a corporation known as the "McCrory Stores Corporation," and is the owner of a chain of stores commonly known as "Five and Ten Cent Stores," one of which it operates at Easton, Maryland.

The plaintiff, Mrs. Mary E. Satchell, is a resident of Easton, and was a visitor and customer at the appellant's

store in Easton on the evening upon which the assault and false imprisonment is said to have occurred.

The declaration alleges "that on or about the 30th day of September, A. D. 1922, the defendant, through its manager and agent, Eugene Dieter, while acting within the scope of his authority, assaulted and beat the plaintiff and unlawfully and wantonly did imprison and detain her in the store of the said defendant operated in the City of Easton, Maryland."

To this declaration the defendant pleaded that it did not commit the wrong alleged.

At the trial below, which resulted in a verdict and judgment for the plaintiff, five exceptions were taken. Four of these relate to the evidence and one to the court's rulings on the prayers.

The plaintiff offered five prayers, of which the first, second and fourth were granted and the others rejected. The defendant asked for ten instructions. Three of these, the sixth, ninth and tenth, were granted, and the others refused. Each of the defendant's first and second prayers asked for a directed verdict for the defendant, the first because of a want of evidence legally sufficient to show that "the officers or agents of the defendant corporation were authorized by the company to have the arrest made which is complained of in the plaintiff's declaration, or that the company subsequently adopted and ratified the acts of the said officer or agent," while the second prayer is a general demurrer to the evidence. In view of these prayers it becomes necessary for us to state the evidence more or less in detail.

The plaintiff testified that on the evening of September 30th, A. D. 1922, she, with her husband and sister, Mrs. Rowe, stopped in at Mrs. Coburn's, the proprietress of what is known as the "Baby Shop," in the town of Easton, and there bought four balls of yarn. After leaving Mrs. Coburn's, she went uptown and met her sister, Mrs. Shafer, in front of defendant's store. She and her sisters entered the store, and went to the yarn counter and there compared the

yarn she had bought from Mrs. Coburn's with that upon
the counter.    At that time there was no saleslady at that
counter.    Thereafter she went to the next counter and bought
a toy for her little girl, and from there she slowly walked
toward the entrance of the store, and while on her way out,
Mr. Dieter, the manager of the defendant's store, grabbed
her by her shoulder and turned her around, saying: "You
got that yarn off of that counter, and I am going to see
into it," and she replied, "Mr. Dieter, I did not get that off
of the counter; I got it from Mrs. Coburn's."    And he re-
plied, "You did," and "He grabbed my satchel and went
through it and he handed me the satchel back, saying he had
no yarn to compare with this.    Then he grabbed my little
girl's cape and said, 'Nice little cape, pretty little cape,' in
a slurring way and handed it back."    She said, "What do
you mean by searching me and accusing me of stealing?
He said, 'That is what I am here for, to protect the com-
pany's goods.'    I said, 'Do you know my name?'    He said,
'No, I do not care to know it.'    I said, 'I want you to know
that I am Mrs. Mary E. Satchell; my husband works on
your car.'    He said, 'Don't tell your husband; forget it;
tell him to come down to the house and I will give him a
drink of whiskey.'    He said he wouldn't have had it hap-
pen for the world.    I walked off and he said to me, 'Don't
tell Percy (her husband); forget it.'    I said, 'He is going
to be the first one I will tell.'    I left him and went out in
front of the Five and Ten Cent Store, and when I got to the
door there he was again.    He said, 'Mrs. Satchell, I am
awful sorry I searched you, but clerks are liable to make
mistakes.    I want you to forget it.'    When asked why he
searched her, he said, 'That was his authority, that he had
to do it to protect his company's goods.' "    When asked how
long she was detained by Mr. Dieter in the conversation
and search made by him, she said about twenty minutes,
and at such time she said there were a large number of people
in the store.    Her sisters, Mrs. Rowe and Mrs. Shafer, were
with her at the yarn counter when she was comparing the

yarn on the counter with that which she had bought of Mrs.
Coburn's, and were also with her at the time of the conver-
sation with Mr. Dieter, and heard what was said and done
by them at that time, and they fully corroborate Mrs.
Satchell in what she said in respect thereto.

Both her husband and sister, Mrs. Rowe, testified that they
were with her at Mrs. Coburn's and saw her buy the yarn
mentioned in her testimony.    The husband said that
Dieter, on the Monday following the occasion referred to,
came to the garage where he was at work and called him to
the back door and said he had come to apologize to him for
searching his wife on Saturday night, saying he was very
sorry he had searched her and the reason he did so was be-
cause of what was said to him by one of the clerks.   He said
he had to do what he did to protect the company's goods, and
asked him "to forget it and not to mention it outside."

Eugene Dieter testified that he was the manager of the
McCrory Store Corporation at Easton, and that it was his
duty to protect the goods in the store.   He further stated
that he recalled the evening of September 30th, 1922, and
remembered seeing Mrs. Satchell in the store, though at the
time he did not know her.   It was then about nine o'clock in
the evening, and when asked to tell in his own language what
occurred that evening in relation to Mrs. Satchell, he said:
"My head clerk, Mrs. Collier, called me, told me she had
seen a lady pick up some yarn and she did not know whether
or not it was replaced on the counter. After a while I walked
up the aisle to the end of the hosiery counter at the extreme
end of the store in front of the cashier's desk.   I approached
the lady and said in a polite way, if I remember correctly,
'Pardon me (or excuse me), did you, by accident, take any-
thing from the counter without having it wrapped?' With
that the lady turned around; she had a bag with her; she
opened this bag and pulled out a ball of yarn similar to what
is here, and gave it to me.   She then said to me, 'You know
who I am, don't you, Mr. Dieter?'   I said, 'No, I don't.'
She said, 'I am Mrs. Satchell, Percy Satchell's wife.'   I said,

'I certainly know your husband.' And then I went over to make a comparison of the yarn we had on our counter, and talked to the effect what a pretty sweater I thought it would make. That was practically all of our conversation." Ques. "What was done with the ball of yarn she handed you?" Ans. "She put it back in her bag. That about ended the conversation; that was practically all the conversation." Ques. "What, if anything, did you do in reference to touching Mrs. Satchell?" Ans. "Absolutely nothing. I never had to do anything of the sort." He denied placing his hands on her or turning her around, and, as he said, made no threats, and did not detain her, and further stated that "the conversation was really of a pleasant nature after that ball of yarn was handed to me." He denied searching her bag or taking the cape from her. In his testimony Dieter also said that about twenty minutes or one-half hour after the occurrence mentioned, "I went out on the sidewalk, and there saw Mrs. Satchell and some other people standing there, but heard nothing said pertaining to the yarn." He also denied saying anything to Mrs. Satchell about giving whiskey to her husband. Dieter was corroborated in what he said by several of the clerks in the store who were in a position to see and hear what was said and done by him at the time above mentioned.

Though the evidence in this case is conflicting, it is clear, we think, from the evidence of the defendant, as well as that of the plaintiff, that Dieter, the manager of the defendant's store, was acting under the theory that the appellee had taken or stolen the yarn from the counter of the appellant and was in the act of carrying it away; and it was to recover it that he said and did what is here complained of.

The rule, as to the liability of corporations in cases of this character, is that if "property be entrusted to an agent or servant for sale or safekeeping, there is clearly an implied authority to do all such things as may be proper and necessary for the protection of that property; or if a servant be assigned to a position requiring the performance of certain

duties, he has implied authority to do all such things as may be required to enable him to perform those duties. And for all acts done within the scope of the employment and the limits of the implied authority, the master is liable, however erroneous, mistaken or malicious such acts may be; but for acts done beyond that limit the corporation cannot be made liable, unless express authority be shown, or there be subsequent adoption or ratification of the act complained of." *Carter v. Howe Machine Company,* 51 Md. 290.

The rule, otherwise stated, is that unless the acts complained of are done within the scope of the employment and the limits of such implied authority, the master is not liable, unless express authority be shown, or there be subsequent ratification or adoption. The necessity for precedent authority or subsequent adoption or ratification exists where the act complained of is not done within the scope of the agent's employment and the limit of his implied authority.

It is said in *Carter v. Howe Machine Company, supra,* "There is a marked distinction between an act done for the purpose of protecting the property by preventing a felony or of recovering it back, and an act done for the purpose of punishing the offender for that which has already been done. There *is no implied authority* in a person having the custody of property to take such steps as he thinks fit to punish a person who he supposes has done something with reference to the property which he has not done. The act of punishing the offender is not anything done with reference to the property; it is done merely for the purpose of vindicating justice." This distinction is recognized in determining the liability of the master in suits for malicious prosecution and in actions for assault and false imprisonment, growing out of attempts made by agents to protect or recover back the goods of their masters entrusted to their care. The action brought in *Carter v. Howe Machine Company* was for malicious prosecution as well as for false imprisonment, though it seems that it was upon the first that the decision chiefly rested, and it is from expressions found therein that the appellant largely

relies in its contention that no liability attaches to the master or corporation without express authority or subsequent adoption or ratification.

The distinction to which we have referred is discussed in an opinion prepared by Chief Judge Boyd in *Balto., C. & A. Ry. Co. v. Ennalls,* 108 Md. 75, where he, after stating it as above, goes on to say: "It is only necessary to keep that distinction in mind to understand why it was said in *Carter v. Howe Machine Company; Beiswanger v. American Bonding Company,* 98 Md. 287, and other similar cases which might be cited, that it was necessary to show that the agent was expressly authorized by the corporation to procure the arrest, or that it subsequently ratified it. Both of those mentioned above were actions of malicious prosecution for prosecuting the plaintiffs for embezzlement, and in such cases nothing done by the agents was for the purpose of protecting property in their charge by preventing a felony or recovering it back, but they were attempts to punish the offenders for what they had already done. There was, therefore, no implied authority in the agent in such case to act, and it was necessary to prove that he was expressly authorized by the corporation to do so. * * * Fischer (the agent) was undertaking to prevent the appellee from feloniously taking away the property of the appellant from its wharf or steamer; as he and the general superintendent believed, as we must in justice to them assume, and he was not simply instituting proceedings against, or causing the arrest of, a party for a crime which he supposed had been previously committed, as is illustrated by *Carter's* case; *Beiswanger's* case; *Green's* case, 86 Md. 161, and others which might be cited." And as the court there said, "It was not necessary, as the appellant seems to contend, to show that Fischer was specially authorized by the company to make this particular arrest."

Dieter was the sole manager of the appellant's store at Easton. To him the corporation entrusted the goods and property contained therein for sale and safekeeping, and it was not only within the scope of his employment to protect

the goods and prevent them from being stolen, and to recover them if stolen, but it was a duty which he owed the corporation which employed him.

He therefore, in attempting to protect the goods and to recover them back if stolen by the plaintiff, was acting within the implied authority conferred upon him, and as a result thereof the appellant became liable to the plaintiff for his acts wrongfully done in connection therewith.

The case of *Bernheimer v. Becker,* 102 Md. 250, is cited and relied upon by the defendant as sustaining its contention that no liability attaches to the principal or corporation in these cases without express authority or subsequent adoption or ratification.

In that case the court said, "an agent or employee about an ordinary business has no such an implied authority" to bind his principal. There the agent of the defendant was manager of the shoe department in a large department store under the immediate supervision of his superiors, who were near at hand, and from that fact it may have been held that there was no such implied authority under his employment. But if there is anything said therein which is open to the construction that an express authority or a subsequent adoption or ratification is essential, where the act done is within the scope of the agent's employment and limit of his authority, it is inconsistent with that which was later said in *Balto., C. & A. Ry. Co. v. Ennalls,* 108 Md. 75.

There was, we think, evidence legally sufficient to go to the jury tending to show the liability of the defendant, and in our opinion the first and second prayers of the defendant were properly refused.

We have carefully examined the other prayers, those granted the plaintiff as well as those refused the defendant and without prolonging this opinion by a needless discussion of them, we will state that we find no error in the court's rulings thereon.

We now come to the rulings of the court upon the evidence. The first relates to the refusal of the court to strike

out the answer of Mrs. Rowe in response to the question, if she knew any of the persons around about the parties in the store at the time of the alleged assault and detention. The answer was "No, sir; I was so excited I did not know them; I felt so bad I did not care to know them. I never looked around. I felt like going somewhere where no one would ever lay eyes on me, I was so embarrassed. I never had anything like that to happen to me before in all my life." The motion went to the entire answer, when a part of it was admissible, hence the motion was properly refused. *Damm v. State,* 128 Md. 665.

The second exception was to the admissibility of certain articles which the husband of the appellee stated he had procured at the store of the defendant from the manager, and which the latter would not allow him to pay for. If this evidence was inadmissible, there was, we think, no harm done the plaintiff by its admission, because of subsequently admitted evidence and admissions of Dieter, the agent of the defendant, in relation thereto.

Nor do we find any reversible errors in the court's rulings on the third and fourth exception.

Therefore, as we find no errors in the rulings of the court, the judgment appealed from will be affirmed.

*Judgment affirmed with costs.*